UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| RAED HASAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:14CV01608 ACL |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

Plaintiff Raed Hasan brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the Social Security Administration Commissioner's denial of his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. Hasan alleged that he was disabled because of high blood pressure, depression, swelling in his legs, heart problems, and mental health problems. (Tr. 157.)

An Administrative Law Judge (ALJ) found that, despite Hasan's severe impairment of obesity and non-severe impairments of anxiety and history of left ventricular hypertrophy, he was not disabled as he had the residual functional capacity ("RFC") to perform his past relevant work as a store manager and cab driver.

This matter is pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c). A summary of the entire record is presented in the parties' briefs and is repeated here only to the extent necessary.

## I. Procedural History

On October 23, 2012, Hasan filed an application for SSI, claiming that he became unable to

work due to his disabling condition on January 1, 2010. (Tr. 134). Hasan's claim was denied initially. (Tr. 73-78.) Following an administrative hearing, Hasan's claim was denied in a written opinion by an ALJ, dated September 16, 2013. (Tr. 12-19.) Hasan then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on August 8, 2014. (Tr. 1-5.) Thus, the decision of the ALJ stands as the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481.

In the instant action, Hasan first claims that the ALJ "committed reversible error by failing to find the severe impairment of depression/PTSD." (Doc. 14 at 8.) Hasan next argues that the ALJ erred by "failing to find that Raed Hasan was limited in his ability to commun[icate] in English." *Id.* at 9.

## II. Applicable Law

### II.A. Standard of Review

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance of the evidence, but enough that a reasonable person would find it adequate to support the conclusion. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence

on the record as a whole, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. The plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the plaintiff's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted). The Court must also consider any evidence which fairly detracts from the Commissioner's decision. *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) (citing *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted). *See also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).

**II.B. Determination of Disability**

To be eligible for DIB and SSI under the Social Security Act, a plaintiff must prove that he is disabled. *Pearsall v. Massanari*, 274 F.3d at 1217; *Baker v. Secretary of Health & Human Servs.,* 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. *See* 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 141-42 (1987); *Fines v. Apfel*, 149 F.3d 893, 894-95 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. *See* 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. *See* 20 C.F.R §§ 404.1520 (c), 416.920 (c). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." *Id.* Age, education and work experience of a claimant are not considered in making the "severity" determination. *See id.*

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. *See* 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. *See* 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which requires an inquiry regarding whether the impairment prevents the claimant from performing his past work. *See* 20 C.F.R. § 404.1520 (e), 416.920 (e).

If the claimant is able to perform the previous work, in consideration of the claimant's RFC and the physical and mental demands of the past work, the claimant is not disabled. *See id.* If the claimant cannot perform his previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. *See* 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if he is not able to perform any other work. *See id.* Throughout this process, the burden remains upon the claimant until he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. *See Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. *See* 20 C.F.R. §§ 404.1520a (b) (1),

416.920a (b) (1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. *See* 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. *See id.* Next, the Commissioner must determine the severity of the impairment based on those ratings. *See* 20 C.F.R. §§ 404.1520a (c), 416.920a (c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. *See* 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. *See id.* If there is a severe impairment, but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity (RFC) assessment. *See* 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

### III. The ALJ's Determination

The ALJ found that Hasan has not engaged in substantial gainful activity since October 23, 2012, the application date. (Tr. 14.)

In addition, the ALJ concluded that Hasan's obesity was a severe impairment; but his history of left ventricular hypertrophy and anxiety were non-severe medically determinable impairments as neither impairment causes more than minimal limitation in the Hasan's ability to perform basic physical and mental work activities. (Tr. 14-15.) The ALJ found that Hasan did

not have an impairment or combination of impairments that meets or equals in severity the requirements of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 16.)

As to Hasan's RFC, the ALJ stated:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the full range of medium work, as defined in 20 CFR 416.967(c).

(Tr. 16.)

The ALJ found that Hasan's allegations regarding the extent of his disability were partially credible. (Tr. 17.)

The ALJ further found that Hasan is capable of performing past relevant work as a store manager and cab driver. (Tr. 18.) The ALJ made the alternate finding that Hasan is capable of performing other jobs existing in significant numbers in the national economy. *Id.*

The ALJ's final decision reads as follows:

> Based on the application for supplemental security income filed on October 23, 2012, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 19.)

### IV. Discussion

As noted above, Hasan raises two claims in this action for judicial review of the ALJ's decision denying benefits. The undersigned will discuss Hasan's claims in turn.

### IV.A. Severity Determination

Hasan first argues that the ALJ committed reversible error when he found Hasan's mental impairments were not severe.[1] Defendant contends that the ALJ properly applied the "special technique" to find that Hasan's mental impairments were not severe because there were not more

---

[1] Hasan does not challenge the ALJ's finding that his history of left ventricular hypertrophy was not severe.

Page **7** of **16**

than mild limitations in various areas of functioning.

To be considered severe, an impairment must significantly limit a claimant's ability to do basic work activities. *See* 20 C.F.R §§ 404.1520(c), 416.920(c). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). Basic work activities mean the abilities and aptitudes necessary to do most jobs, including physical functions; capacities for seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, coworkers and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. §§ 404.152l(b); 416.92l(b). "Severity is not an onerous requirement for the claimant to meet, ... but it is also not a toothless standard." *Kirby*, 500 F.3d at 708.

The ALJ found that Hasan's "medically determinable impairment of anxiety does not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and is therefore nonsevere." (Tr. 14.) As support for this finding, the ALJ indicated that he had considered the four functional areas set out in the regulations for evaluating mental disorders and in section 12.0C of the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix 1). (Tr. 14.) The ALJ noted that, under the regulations, a mental impairment is not severe if it results in no more than mild limitations in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace) and none in the fourth area (episodes of decompensation). *See* 20 C.F.R. § 416.920a. The ALJ found that Hasan's mental impairments resulted "in <u>mild</u> restrictions in activities of daily living; no difficulties in maintaining social functioning; and <u>no</u> difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation." (Tr. 15; emphasis in original.) Substantial evidence supports these findings. The ALJ reviewed Hasan's reported activities of daily living, as well as his mental

health treatment records, including the fact Hasan was diagnosed with adjustment disorder and PTSD, noting the most problematic symptom detected by the examiner "was decreased sleep and nightmares." *Id*. The ALJ commented:

> While there may certainly be some adjustment difficulties caused by the death of [Hasan's] daughter in a bus explosion and subsequent relocation of the family to the US from Iraq, the mental status reports in the file are unremarkable (2F/12, 3F/12, 19, 28), as was his appearance and testimony at the hearing.

*Id.*

With regard to activities of daily living, the ALJ noted that Hasan indicated in his function report that he got up, ate breakfast, took his medication, goes to doctor appointments, and watches television. (Tr. 15, 169.) He also shops for groceries with his wife weekly. (Tr. 172.) Hasan reported experiencing difficulty with some activities, such as attending to personal care and performing household chores, but these difficulties appear to arise from his alleged physical impairments. (Tr. 170.) Hasan's reported daily activities are consistent with the ALJ's finding of "mild" restrictions in this area.

The ALJ next found Hasan had no difficulties in maintaining social functioning. In his function report, Hasan indicated that he had no problems getting along with family, friends, neighbors, or authority figures. (Tr. 174, 175.) At the administrative hearing, Hasan testified that he had conflict with his wife related to their daughter's death. (Tr. 41, 45.) Hasan explained that, when he was living in Iraq in 2010, his daughter died in an explosion. (Tr. 41.) Hasan's wife blames him for their daughter's death because his wife had expressed her desire to leave Iraq due to safety concerns prior to the explosion. *Id.* As a result, Hasan testified that he tries to avoid his wife. (Tr. 45.) Hasan also testified that he gets angry easily with his sons. (Tr. 49.) The medical evidence also reveals that Hasan reported that he felt connected to his family. (Tr. 269, 276, 285, 398, 407, 416, 424, 433.) Hasan did not display anger at his medical appointments

and was always cooperative. (Tr. 226, 228, 266, 268, 275, 284, 398, 407, 424, 433.) Hasan was also described as "calm" on multiple visits (Tr. 226, 228, 268), and even "friendly" (Tr. 266) and "thankful" (Tr. 424) on individual occasions. In sum, the evidence of record reveals that Hasan's reported conflict with his wife is not as a result of a mental impairment, but due to his daughter's death. Although Hasan testified that he occasionally becomes angry with his sons, there is no evidence that his relationship with his sons was affected by his mental impairment. The ALJ's finding that Hasan has no difficulties in maintaining social functioning is supported by substantial evidence.

With regard to concentration, persistence, or pace, the ALJ found that Hasan had no difficulties. At the hearing, Hasan testified that his family members frequently tell him that he has said things about which he has no memory. (Tr. 50.) Hasan did not otherwise describe any difficulties with concentration, persistence, or pace at the hearing. The ALJ stated that Hasan's medical records consistently note that his memory and concentration were intact. (Tr. 15.) This is supported by the medical evidence. (Tr. 268, 275, 284, 398, 407, 416, 433.) Thus, the ALJ's finding that Hasan has no difficulties with concentration, persistence, or pace is supported by substantial evidence.

Finally, the ALJ found that Hasan had no episodes of decompensation that have been of extended duration (Tr. 15), and Hasan has not alleged any such episodes. The ALJ's finding regarding the fourth broad functional area for evaluating mental disorders is supported by the record.

In addition to properly analyzing the four functional areas discussed above, the ALJ stated that the alleged severity of Hasan's mental impairments is not fully supported by the treatment records, which consistently report that Hasan's thoughts were logical and goal-directed, he had no

hallucinations or other psychotic symptoms present, his judgment was intact, and he was able to follow instructions. (Tr. 15, 268, 275, 284, 398, 407, 416, 433.) The ALJ stated that, although Hasan continues to have some residual symptoms even with continued medication compliance, he remains capable of performing work-related tasks. (Tr. 15.) The ALJ remarked that Hasan may have adjustment difficulties caused by the death of his daughter and subsequent relocation of his family to the United States from Iraq, but pointed out that Hasan's mental status reports are unremarkable. *Id.* Finally, the ALJ acknowledged that a non-examining state agency psychologist expressed the opinion that Hasan's anxiety-related disorder results in moderate restrictions of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (Tr. 15, 61.) The ALJ, however, indicated that he was giving "little weight" to this opinion due to its inconsistency with the objective medical evidence. (Tr. 15.) As previously noted, the ALJ found that Hasan had only "mild" limitations with regard to activities of daily living and no limitations in the other three areas.

In support of his argument that the ALJ erred in finding his mental impairments were non-severe, Hasan argues that a physician at Barnes Jewish Hospital noted that Hasan's depression and anxiety may have psychotic features that are poorly controlled. (Tr. 357.) On August 23, 2012, a primary care physician noted that Hasan denied suicidal or homicidal ideation but his depression/anxiety was poorly controlled, and he "may have some psychotic features with night-time screaming episode." (Tr. 357.) Hasan had not yet received mental health treatment at that time. Hasan's subsequent mental health treatment notes reveal that Hasan did not exhibit any psychotic symptoms. (Tr. 268, 275, 284, 398, 407, 416, 433.) Thus, Hasan's argument lacks merit.

Hasan also argues that the fact he was assessed Global Assessment of Functioning ("GAF") scores of 41-50[2] on his first six visits to SLUCare Psychiatric Clinic indicates that his psychiatric condition is severe. According to the Diagnostic and Statistical Manual of Mental Disorders (DSM-V), the GAF scale is intended for use by practitioners in making treatment decisions. *American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders* 32-33 (4th ed.-Text Revision 2000) ("*DSM IV-TR*"). The most recent version of the DSM, however, dropped GAF from inclusion because of its "conceptual lack of clarity (*i.e.*, including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice." *DSM-V* 16 (5th ed. 2013).

Moreover, neither Social Security regulations nor case law require an ALJ to determine the extent of an individual's mental impairment based solely on a GAF score. In fact, the Commissioner has declined to endorse the GAF scale for "use in the Social Security and SSI disability programs," and has indicated that GAF scores have no "direct correlation to the severity requirements of the mental disorders listings." *See* 65 Fed. Reg. 50746, 50764-65, 2000 WL 1173632 (August 21, 2000). While the Commissioner has declined to endorse the GAF scale for use in the Social Security and SSI disability programs, GAF scores may still be used to assist the ALJ in assessing the level of a claimant's functioning. *Halverson v. Astrue*, 600 F.3d 922, 930-31 (8th Cir. 2010) (GAF score may be of considerable help in formulating RFC, but is not essential to RFC's accuracy).

---

[2] A GAF score of 41-50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *See American Psychiatric Ass'n., Diagnostic and Statistical Manual of Mental Disorders* 34 (Text Revision 4th ed. 2000) ("*DSM IV-TR*").

In this case, as Hasan notes, he was assessed with GAF scores of 41-50 at his first six visits to SLUCare, from September 2012 through February 2013. At Hasan's initial visit in September 2012, he complained of nightmares every night about death, difficulty sleeping, experiencing choking sensations in his sleep, anxiety and flashbacks before going to bed, low concentration, and low mood since his daughter's death. (Tr. 267.) Upon examination, Evelynn Stephens, M.D., noted calm and cooperative behavior, restricted affect, normal concentration despite Hasan's complaints of impairment in this area, intact memory and thought process, and logical thought content. (Tr. 268.) Dr. Stephens diagnosed Hasan with adjustment disorder[3] with mixed emotional features and post-traumatic stress disorder[4] ("PTSD"), and assessed a GAF score of 41-50. (Tr. 269.) Dr. Stephens prescribed Zoloft[5] to treat Hasan's PTSD symptoms and prescribed Seroquel[6] to treat Hasan's nightmares and anxiety before bed. (Tr. 269-70.) Dr. Stephens noted that Hasan's "most problematic symptom is decreased sleep and nightmares" on October 11, 2012, and on October 29, 2012. (Tr. 274, 285.) Hasan continued to complain of nightmares, with no worsening in symptoms in December 2012, January 2013, and February 2013. (Tr. 397-415.) On March 28, 2013, Dr.

---

[3] A disorder the essential feature of which is a maladaptive reaction to an identifiable psychological stress, or stressors, that occurs within weeks of the onset of the stressors and persists for as long as 6 months. *Stedman's Medical Dictionary*, 567 (28th Ed. 2006).
[4] Development of characteristic long-term symptoms following a psychologically traumatic event that is generally outside the range of usual human experience; symptoms include persistently re-experiencing the event and attempting to avoid stimuli reminiscent of the trauma, numbed responsiveness to environmental stimuli, a variety of autonomic and cognitive dysfunctions, and dysphoria. *Stedman's* at 570.
[5] Zoloft is indicated for the treatment of depression. *See* WebMD, http://www.webmd.com/drugs (last visited September 24, 2015).
[6] Seroquel is indicated for the treatment of schizophrenia, bipolar disorder, or sudden episodes of mania or depression associated with bipolar disorder. *See* WebMD, http://www.webmd.com/drugs (last visited September 24, 2015).

Stephens increased Hasan's GAF score to 51-60.[7] (Tr. 428.) Hasan complained of nightmares and reported anxiety at that time. *Id.* On May 9, 2013, Dr. Stephens again assessed a GAF score of 51-60. (Tr. 432.) She noted that Hasan was notably less anxious. *Id.* He continued to complain of nightmares. *Id.* Hasan reported that he experienced some "anxiety feelings," and that he talked to friends in the area at times for support. *Id.* Dr. Stephens noted that Hasan had no overwhelming anger, no noted suicidal or homicidal thoughts, no manic or psychotic symptoms, he was cooperative, and his thoughts were logical and organized. (Tr. 433.) Dr. Stephens adjusted Hasan's dosage of medication to treat his nightmares associated with PTSD. *Id.*

The treatment notes discussed above support the ALJ's finding that Hasan is experiencing adjustment difficulties caused by the death of his daughter and subsequent relocation to the United States, but his mental status reports are essentially unremarkable. Hasan's treating psychiatrist consistently noted that Hasan's most problematic symptom was nightmares and related decreased sleep. The initial low GAF scores assessed by Dr. Stephens appear to be attributed to these symptoms. Hasan's nighttime anxiety and nightmares associated with his PTSD, however, would not be expected to affect his ability to work. Further, there is no direct correlation between Hasan's GAF scores and a mental impairment's severity, and the ALJ had no obligation to credit or even consider GAF scores in the disability determination. Thus, Hasan's reliance on his GAF scores is without merit.

In sum, the ALJ properly analyzed the impact of Hasan's mental impairments on the four functional areas set out in the regulations. The ALJ discussed the medical evidence of record

---

[7] A GAF score of 51 to 60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM IV-TR* at 34.

and cited specific medical evidence, as well as Hasan's own statements, in support of his findings. As the ALJ remarked at the end of the administrative hearing ". . .the mental status exams look pretty normal,. . .I can understand how [Hasan would] be upset, I just don't know how it's limiting vocationally." (Tr. 54.) The ALJ's determination that Hasan's mental impairments are not severe is supported by substantial evidence in the record as a whole.

## IV.B. Step Four Determination

Hasan next argues that the ALJ erred by failing to find that Hasan was limited in his ability to communicate in English at step four of the sequential analysis. Hasan accurately notes that Hasan testified at the administrative hearing with the aid of an Arabic interpreter. (Tr. 37.) Hasan testified that he can speak and write only limited English. (Tr. 47.) Defendant contends that vocational factors, such as a claimant's English proficiency, are not relevant at step four of the sequential analysis.

The ALJ found that Hasan has the RFC to perform the full range of medium work. (Tr. 16.) The ALJ further found that Hasan was capable of performing his past relevant work as a store manager and cab driver. (Tr. 18.)

Step four of the sequential analysis denies benefits to a claimant whose impairment does not prevent him from performing the duties of his previous work. *See* 20 C.F.R. § 416.920(e). The Secretary has provided that vocational factors, such as education, will not be considered at step four. *Id.* § 416.960(b)(3). The inability to communicate in English is an element of the vocational factor of education, *see id.* § 416.964(b)(5), which the Secretary's sequential analysis reserves for step five. *Id.* § 416.920(g). *See also Garcia v. Sec'y of Health and Human Servs.*, 46 F.3d 552, 555-56 (6th Cir. 1995) (holding that the ability to speak English is not a factor for

consideration in step four); *Ordonez v. Massanari*, No. C00-4145-DEO, 2001 WL 34008720, at * 15 (N.D. Iowa Sept. 13, 2001) (same).

In this case, the ALJ found that Hasan had the RFC to return to his past work at step four of the sequential evaluation. The record supports that neither Hasan's physical or mental limitations would prevent him from performing the jobs of store manager and cab driver. The regulations do not require that the ALJ consider Hasan's limited ability to communicate in English in making this determination. Consequently, the ALJ did not err in failing to consider Hasan's inability to communicate in English at step four. Further, the ALJ made the alternative step five finding that Hasan could perform other work that existed in significant numbers in the national economy and was therefore not disabled. (Tr. 18.) In so finding, the ALJ considered that Hasan "is not able to communicate in English, and is considered in the same way as an individual who is illiterate in English." *Id.* Thus, substantial evidence on the record supports the ALJ's decision finding Hasan not disabled.

## V. Conclusion

In sum, the decision of the ALJ finding Hasan not disabled is supported by substantial evidence in the record as a whole. As a result, the ALJ's decision is affirmed.

Accordingly, Judgment will be entered separately in favor of Defendant in accordance with this Memorandum.

*/s/ Abbie Crites-Leoni*
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 30th day of September, 2015.